Good morning. May it please the court. My name is John DeGrosso Smith and I represent the appellant, Jeremy Marks, in this matter. An employee of the state of Maryland used his mind and his experience as weapons to purposefully target a private citizen for a dramatic and irreparable economic harm. On a motion to dismiss, the district court made factual determinations and found that such conduct was not malicious under the Maryland Tort Claims Act. This is grave error and it sets a dangerous precedent, especially at a time when the government is becoming increasingly more involved in the private marketplace. Today, that private citizen, Jeremy Marks, asked this court to give him a chance to be heard and to make that state employee, Thomas Dann, answer for the harm that he caused Mr. Marks. In this case, Thomas Dann, a state employee who works in the Maryland Venture Fund, developed a scheme that singled out a disfavored company founder, a minority shareholder, Jeremy Marks, in order to selectively and massively dilute Marks' ownership interest in a private corporation. In designing his investment plan, Dann was able to exploit the directors' and shareholders' collective desire to harm Marks, as well as the conflict of interest that they had between their transaction that Mr. Dann designed. Dann, who was a venture capital veteran before becoming employed by the state, knew that the company had previously sued Marks in an effort to repurchase his shares in the company for a mere $100, and that that district court case was pending. Dann also knew that the parties were, at the time, currently pursuing limited discovery concerning financial and valuation matters for the express purpose of then attending a court-ordered mediation. In order to facilitate what Mr. Dann called the company's quote-unquote rogue shareholder problem, he designed and implemented what ultimately was a two-part scheme that was intended to devalue Marks' interest in the company and force him to sell at an artificially low price at the intended mediation. The first part of the scheme permitted the Maryland Venture Fund, of which Dann was and is the managing director, to buy into the company at an exceptionally low price that was based on an inappropriately low valuation of the company. That valuation was set by Mr. Dann, not by a third party or an independent valuation expert, but in fact the company had other valuations that it had paid for that were substantially higher than the one that was set by Mr. Dann unilaterally. This part of the scheme resulted in a massive dilution of all the existing company shares. Because the Maryland Venture Fund was able to buy in at such an artificially low rate, it massively diluted all the shares of the owners of the company. Can I just ask a question if I could just stop you there for one moment? So it seems that what Mr. Dann would say is fine, like maybe all of that is true, I sort of manipulated things so that I could get a really good deal for the state on this. But isn't that almost sort of the opposite of malice for these purposes? He's doing it for market advantage and that's not malice, it's not personal, it's not animosity, he's just trying to make some money. I understand that, Your Honor, and I think that the answer to that is that I think that is exactly what Mr. Dann would say. And the difference is that if you negotiate a deal between a buyer and a seller, obviously one side is going to try and negotiate to their best advantage, and the other side is going to negotiate to their best advantage. And if this was an instance where the buyer is coming to this court saying that the seller did me wrong somehow and was malicious in negotiating, I could see the court saying, well, wait a minute, he was on one side of the transaction trying to get a good deal for the state and you were on the other side of the transaction and it's the rough and tumble business world and those things happen. But that's not what happened here. What happened here is Mr. Marks was not on the other side of this transaction. This was a transaction negotiated in coordination between a private company and a control group that was inherently conflicted. So just tell me what I'm getting wrong here. As I understand it, that sort of goes to whether there was sort of a breach of fiduciary duty or some wrongdoing in the first place. But the malice inquiry is more about motive, right? Not whether anyone did anything wrong, but why they did the wrong thing. Understood. And just based on even your argument here today, it sounds like you're saying he did this wrong. Let's assume for a minute he did wrong. But the reason he did it was to make money, to get a better deal and make money for himself or his employer, whoever it is. But it was sort of a commercial motivation rather than personal animus. That's what I'm struggling with. Well, the standard, I mean, in this instance, due to the position that the shareholders were in at that time, what we call the control group, Dan aided and embedded a breach of fiduciary duty. That's an intentional tort under Delaware substantive law. So this wasn't a negotiation simply for a good deal where I want to pay you this amount and you'd like this amount. So you're saying the fact that he became a director of the company placed him in a different posture than somebody who was simply negotiating a deal? It did ultimately, Your Honor. There's two violations that we contend. The first is you aid and embed a breach of fiduciary duty. That's a separate intentional tort under Delaware law that we allege that Mr. Dan committed before becoming a member of the board of directors. And to answer your question, Justice Harris, Mr. Dan recognized that there was this dispute out there between the company and a third party. So this wasn't an effort to get a good deal for the state directly. What happened was he saw an opportunity to dilute and exploit the interest of that minority shareholder directly and design... And why would he want to do that? Has he ever met him or had any dealings with him? Not to my knowledge, Your Honor. He has never met him. But Mr. Dan, in correspondence that is in the record, referred to Mr. Marks as a rogue shareholder. During testimony he stated that Mr. Marks is unreasonable and something to the effect that he wouldn't want to get into the mind of someone like that. And I would also point out for the court, for the purposes of evaluating malice, there are lots of times when a state actor has never met somebody and the state courts have found that malice exists. For example, a car stop where a police officer pulls somebody out of a car and beats them. They never met them. They didn't know them. But maybe there was something that happened during that course of events... But there is an interaction, a personal interaction between the parties that you just don't have here. That is correct, Your Honor. We do not have a personal interaction with two people standing together. But what we do have is an instance where a state employee, working to go into the private marketplace, identified a private citizen and engaged in what we believe to be an intentional tort, which is to aid and abet a breach of fiduciary duty, to ultimately devalue that person's interest in order to get a good deal for the state. In our view is that if that's allowed, if the state government is going to be involved in the private marketplace and state employees are permitted to seek out the minority shareholders or others and engage in intentional torts and that that is not considered malicious or a jury is not permitted to determine if that's considered malicious, then we are setting a circumstance where the state government could be some sort of superpower in the private marketplace. But can't you sue the state in state court? I mean, isn't that the kind of escape valve here? You could have sued the Maryland Venture Fund in state court, right? We could have, Your Honor. And there's a cap. There's a cap on that amount. But sometimes it's not sort of an invariable cap, right? Isn't there a way to go above the cap? We believe in this instance, as our understanding of the law, Your Honor, there was a cap, but we also more importantly believe that Mr. Dam was not acting within the scope and furtherance of his duties of the Maryland Venture Fund. While the Maryland Venture Fund would certainly want to negotiate a good deal with a private company, we do not believe it's within the scope of his duties to set out to commit an intentional tort. Right. I understand that. But I guess I'm saying if the case were to come out contrary to your view, there would still be sort of addressing your policy concern that if we say this isn't malicious, that means that the state can do whatever it wants. I mean, the state has waived its own sovereign immunity, right? It has, Your Honor. And I believe in this instance, the time has run for that action. So just factually, and certainly things could have been done differently before I stood here today. But to answer your question, if this panel were to determine that there's no evidence that could be presented to a jury where they could determine that this could be malicious, then there wouldn't be a remedy left for Mr. Mark as it stands today. You're here on the 12b-6. And so the question is, did you plead fact-sufficient to alleged malice? Yes, Your Honor. Was there an Iqbal issue with you pleading? We don't believe so, Your Honor. And we believe, especially in this instance, because in the pending district court case, during the financial and valuation discovery, actually enabled us to effectively have discovery on financial and valuation matters, which ultimately turned out to include this particular issue. So in this instance, it was almost like we had pre-discovery prior to filing this case. So the level of detail that we've included in the complaint, down to emails from Mr. Dan specifically describing the deal, emails where he describes the intent of what it would do to the rogue shareholder, how it would facilitate resolution of the problem, the level of detail we have, I would submit to the court that if that's not enough, then probably it would be very difficult for any litigant to be able to meet Iqbal in this arena. Well, why didn't you object to the judge considering the affidavit of Mr. Dan? And if you didn't object, did the trial judge give you any notice that he was going to convert it to a summary judgment motion, since he obviously considered it and some material from you? Yes, Your Honor. I thought we were just talking about a 12B6 motion. Your Honor, we did not receive any indication from the court that the court was treating this matter as summary judgment. And there were documents that we submitted that had been referenced in the complaint that were not attached to the complaint. And in response, yes, Mr. Dan did provide actual sworn testimony by way of a declaration. And the court did not give indication that it was deciding it based on a summary judgment paper. And I would also follow up to indicate that as it relates to, you know, the ability to have facts sufficient to give rise to a claim, it seems in this instance the court has countenanced Mr. Dan's explanation. And I know Justice Harris, you talked about that, you know, if Mr. Dan's intent was not ill motive, it wasn't to hurt Termi Marx. By referring to Mr. Marx as a rogue shareholder, by targeting him for dilution, he was just trying to get a good deal for the state. Perhaps a jury will find that. Maybe a jury would listen to that motive and say, you know what, I think this is what you were trying to do. You hadn't met him. You didn't know him. And I think you were really just trying to do the best you can in your job. On the other hand, Your Honor, I think someone could find that by referring to him as a rogue shareholder, by specifically looking at a minority shareholder in a position of weakness and then aiding and abetting an intentional tort to allow for a massive dilution that's going to be shouldered by that person alone. We think a jury could find differently. We think a jury could find ill motive. We think a jury could find that he was intending to injure Mr. Marx. And if he's intending to injure Mr. Marx in order to get a good deal for the state, we believe that that is malicious and a jury could find that. Should there have been some, I mean, I guess what I'm really struggling with is that there should have been something about sort of why he had it in for Mr. Marx. Like if this whole thing was designed because he so hates Mr. Marx that he just really needs to grind him into the ground, like shouldn't there be something in the complaint that would support that? I would answer the question this way, Your Honor. I don't believe that that's the standard that we have to meet. I don't believe we have to meet a standard that says Mr. Dan knew Mr. Marx and wanted to really hurt Mr. Marx as a person that he knows Mr. Marx. And that's because malice is a broader principle than just personal animosity. Yes, yes, sir. An ill motive, an intent to injure. So our feeling, Your Honor, is because I would just draw it this way, and I know I'm running out of time in my primary argument. If this was simply that the state of Maryland got a good deal for the for the state and as a result of a low investment, it happened to dilute the interest of Mr. Marx, who is a minority shareholder, incidentally. I would agree with the panel and the arguments from Mr. Dan that that's not malicious. That was a deal that had an incidental effect of harming a minority shareholder. And the state has characterized our complaint that way. And the district court characterized our complaint that way. But that's not what we allege. What we allege is that Mr. Dan focused on Jeremy Marx, recognized the position he was in, used his experience as a venture capitalist to craft a deal that would seek to create an artificially low valuation that the company could use at mediation to say, look at this investment we got. But while using that artificially low valuation, knowing that the conflicted shareholders would not actually bear the brunt of that artificially low valuation because he provided a kickback that would pop up their shareholder interest by way of stock options. As Your Honor pointed, once he joined the Board of Directors. Mr. Smith, before your time runs out, let's talk about your motion to amend. Yes, ma'am. I mean, whether you should have been granted leave to amend. Aren't we in a little bit of a difficult position without a proposed amended complaint? How do we evaluate what you would have alleged had you been given the opportunity? Yes, Your Honor, I can address that. What's interesting is that we didn't file a motion to amend. And it's our understanding that it's inappropriate to respond to a motion to dismiss, procedurally inappropriate to respond to a motion to dismiss by presenting, you know, an amendment. That needs to be done by separate motion. So the documents that Justice Floyd referenced and the affidavit that Mr. Dan had referenced, the court apparently determined sua sponte that having seen these other documents that even if considered, that wouldn't give rise to a sufficient claim. If you would have filed a motion to amend, could you not have, following the court's ruling? Is there anything that would have precluded you from doing that? Well, I think... And tendering a proposed amended complaint? I don't know, Your Honor, procedurally, whether there's something that would have prevented us. But because the court issued an order determining that basically denying sua sponte our right to amend and stating that the court had already considered the other materials and stated that it would be futile for us to amend, I think that we would have potentially been arguing with the court at that point, Your Honor, since the court determined that... What would you allege that you didn't allege? We think the complaint is sufficient as it is, Your Honor. There are... That's not my question. What would... If we disagree with you, what would you be alleging in your amended complaint that you did not allege now? What we would allege, Your Honor, is there are certain references contained in the supplemental documents that were submitted in connection with the motion, like, for example, certain testimony that was received during the deposition of Mr. Dan, where he referred to... Like a raging bull reference? Yeah, I believe he referred to him as an unreasonable person. He referred to him as somebody that I wouldn't try to get in the mind of someone like that, that Mr. Dan also had provided direction to those conflicted shareholders about what things to show Mr. Marks and what not to show him, because he... I think that was the raging bull reference, because he would see it like a red flag on a bull and see that. Those would be the types of additional facts that we would allege, Your Honor, and I think for the court's consideration, it's not as if we have a whole bucket of extra facts that we would include in the complaint if the court were to disagree with us and send it back down for amendment. So I think it would be fair to say that if the court were to see and were to consider what's in the supplemental materials, that would fairly be the balance of what any amendment would look like in the complaint. All right, sir. Thank you. Thank you. Ms. Bernhardt. Thank you, Your Honor. Good morning. May it please the court. Preliminarily, I'd like to correct one thing, and that is that the district judge did not rely on Mr. Dan's affidavit in deciding the motion to dismiss, nor did she rely on the For example, the deposition testimony of Mr. Dan. The district judge has a list of documents that she considered integral to the complaint that she lists in footnote seven of her opinion, and that is at Joint Appendix 400, and she specifically disclaimed any reliance on Mr. Dan's affidavit because she was not converting the motion to a motion for summary judgment. The documents integral to the complaint are the only ones on which the district judge relied. As the district judge correctly found, those documents do not show any malice on the part of Mr. Dan, and preliminarily, I'd like to point out that Mr. Marks' argument is based on a faulty premise, and that is that it was an effect of the MVS investment to dilute Mr. Marks' investment in the company. Those documents are based on the warranty of Max Tenna that Mr. Marks did not own any interest in the company anymore, and indeed, if you look at Joint Appendix 196, for example, the stock purchase agreement for the Series A preferred stock, the Max Tenna warrants that the only owners of the company are listed on the cap table, which is at Exhibits D and H, and that it's a breach of the agreement if Mr. Marks owns a share of the company, and so all the documents are based on the warranty of Max Tenna, and they're based on the premise that Mr. Marks does not own a share in the company, and if he owns no shares of the company, he can't be diluted by this investment. And so this entire case is based on that faulty premise of Mr. Marks, and for example, the sealed Joint Appendix at 266 and 271, and the redacted versions of that appear at Joint Appendix 498 and 473, show that Marks' shares have been taken back into the company's treasury, and so this whole case really is based on that faulty premise. If indeed Mr. Marks were to succeed in his claim that he did not steal trade secrets, he was not terminated for cause, and that he really should own shares in the company, that would breach this investment. This investment, you know, would no longer be an investment of the state of Maryland, and so this whole case is based on that faulty premise. And then moving on to his allegations with respect to malice, these integral documents do not raise any plausible inference of intentional wrongdoing on the part of Mr. Dan. The MVF investment came about because Max Tena approached the Department. Right, but I think he's saying something a little different, isn't he? What he's saying is that because of how MVF participated in this deal, that Mr. Dan became a player in the corporation. I mean, he operated with the exact same sharp elbows and motives and interests as all the other directors of the corporation. It's not like the government official sitting in his office and making decisions, which is the characteristic type case. This guy actually entered the playing field and participated as a team member of the corporation that was at odds with its former member. And so he's arguing something a little bit different, and that's why I'm not convinced it's quite as black and white. While you may be right, ultimately, it doesn't seem to me that it is entirely preposterous, as you're saying. I think it's a little closer. Well, he's arguing that, Your Honor, but if you look at the documents, as he pointed out to the court this morning, his entire complaint is based on these documents that were obtained in the other litigation. And the documents are part of the record. And the district judge looked at the documents, and the documents don't support the arguments he's making. In other words, there's no plausible inference one can draw from the documents. Well, he calls him irrational. He calls Mr. Marks irrational. He calls him a bull. He's instructing them to withhold certain evidence regarding valuations or potential valuations that have been made, because he'll just fix like a laser beam on the higher $100 million number. There's some pretty specific things that are going on there. Why shouldn't he be allowed to amend his complaint, at least to give it a shot? Well, Your Honor, because the description of those documents that Your Honor just gave, which is his description of them, the district judge actually looked at the documents rather than just his characterization of the documents, and they don't support that. What they show is that— So then he loses on summary judgment, but is that a determination that the court makes at this juncture? I think it does, Your Honor, when the complaint is based solely on the documents. The documents can't—and there's no plausible inference. Remember, it's the plausible standard. There's no plausible inference in these documents that Mr. Dan, who was negotiating on behalf of the state, had a personal animus or any personal interest in this litigation. In fact, if you look at the entire text of these documents to which he's referring, you'll see that the basis that he—what Mr. Dan said was he's irrational because he thinks the company's worth $30 million, and it's in peril of failing. It can't meet its payroll, it can't borrow money, it's about to run out of cash, the key shareholders have had to extend loans that can't be repaid, and that's the basis. This is not rational to think it's worth $30 million, and don't show him this speculative valuation that's based on something that may never happen, because that would be like waving a red flag in front of a bull, because he has this unfounded opinion on the value. It's not unfounded. I mean, you may say it's not adequately demonstrated to be a realistic probability, or whatever term you want, of income to the corporation, but they did, in fact, have discussions, did they? Who else was it? Google? Was someone else? Concerning different aspects of the potential business supply relationship. So just because it wasn't a done deal, are you saying that it has absolutely no place in being alleged? No, Your Honor. What I'm saying is, if you look at the integral documents on which this claim is based, what they show is that there was no, they don't support any plausible inference that Mr. Dan thought the company was worth any more than the $1 million that he valued it at. What about the fact that he told them, you know, share this with Mr. Marks, don't share that with Mr. Marks, that he was trying to filter the information? Well, what it says is, don't show it, because that's speculative, that's not a realistic valuation. Let's follow up on Judge Keenan's player question to you. Was it before he became a player, or after he became a player, that they switched the structure of the deal from a convertible note to an equitable investment? Well, I don't agree with the premise of the question, that he ever became a player, Your Honor. I mean, he became a member of the board. I'm going to use that question, because that's the way Judge Keenan is. But I don't understand the facts on which describing him as a player.  Let's look at the director for player, then. Yes, Your Honor. Let's look for the long-term. Well, he became a director, not in his personal capacity, but as a designee of the secretary of the department in October, which was after the structure of the deal changed. He didn't become a director until after the MVF investment had been approved by the board, a board that did not include him. And the structure of that MVF investment not only provided, and was not only signed by him in a representative capacity, and provided no personal benefit to him whatsoever, he joined the board as a designee, and the secretary could at any time decide to have someone else as a designee. It's totally in a representative capacity. And the MVF investment also requires two independent directors be named to the board. It does not provide for a non-vesting period for the stock options, and no-cost stock options to the employees. It simply leaves that up to the board, a board that will be required to have two independent directors. And so the characterization in the complaint of these integral documents is simply inaccurate. They don't show any of those things. They don't show a conflict of interest, they don't show that Mr. Dan had any personal animosity, they don't show that he got any personal benefit, they don't show that he was acting in any capacity other than in the interest of the state, and they certainly don't show that he was acting outside the scope of his employment, because under Maryland law, he would have had to have been acting solely for his personal benefit in order to be not acting on behalf of the employer. And at the end of the day, it's the state... He's not arguing that, he's arguing malice. He's arguing both, your honor. Well, yeah, but his case is basically malice. His primary argument is malice, but he certainly also argues that he acted outside the scope of his employment. And all of the cases on which he relied, there was some personal retribution involved. For example, Newell v. Reynolds, the employees who worked against the elected state's attorney, they'd worked for his opponent. And Manders, there was a corrupt... There was always... Locking somebody out of their office because they sued him for breach of contract. There was repossessing the car because he got into an angry exchange on the phone. There was always some personal retribution, some grudge. And here, there's just... The only evidence is that Mr. Dan negotiated a good deal for the state. There was a high-risk investment. He had to protect the state's interest. The litigation was part... Doing due diligence with respect to that litigation was critical to protecting the state's interest. It was hurting the company. All of this is documented in the integral documents. That the memorandum to the file, which appears at Joint Appendix 313, details all of the peril that Max Tana was in. The key projects... Your Honor referenced the Google project. That was in danger. They were all in danger. The company was in peril of not being able to meet any of its key obligations, retain its employees, meet its payroll. It couldn't attract any investment. For that reason, it approached this high-risk Maryland venture fund. And then moving to his... What else he could prove if he were to amend his complaint. The documents he produces simply make his case weaker. Because they show all of what I... They confirm everything I just said. And they also show that the state couldn't have entered into this deal had it not taken... Mr. Dan exercised this care in protecting the state's investment. And that the purpose of this transaction was to try to save this company and to save these Maryland jobs. And that Mr. Dan was motivated solely by saving this company, saving these jobs, and protecting the state's investment. And that's what these documents show. That's what the integral documents show. That's what the additional documents show. And they don't show that he had any personal animosity towards Mr. Marks. And to the extent he thought he was irrational, he thought he was irrational because his view of the company was so out of line with what was really happening to the company. Isn't the question of intent under Maryland law generally an issue for the trier of fact and not to be decided on summary judgment, much less a 12B6 motion? That's true, Your Honor, where there's a dispute of fact on which the inferences from which you can draw... But here there's no dispute of fact. It's all document-driven. And the documents show Mr. Dan's state of mind. And they show that he lacked malice. They show that it was all business. It was all to protect the state and this company and to fulfill the mission of the Department of Business and Economic Development and to save these Maryland jobs from this company that was doing business in Maryland. And that was his sole motivation. That's what the documents show. They don't raise any inference that he had... that it was motivated to hurt Mr. Marks in any way, especially when one remembers that he wasn't even a shareholder anymore. And that really, the premise of his argument is that he was a shareholder. And all the documents are based on the warranty of Max Tena, that he was no longer a shareholder. How do you want us to think about this amendment issue? There's no motion to amend, right? So Marks never moved to amend? Yes, Your Honor. I think for that reason, his argument that the district court judge committed error is not well taken for that reason. I mean, he did not... he could have moved for leave to amend at numerous points along the way. How do we review sort of a district court... I'm just having trouble. How do we review a district court decision against amendment where no one has moved to amend? I guess it's under abuse of discretion? Well, I think normally... It seems unusual. Well, it seems unusual that... I mean, it would seem unusual to fault the district judge for not granting a motion that was never made. I think that's the position he's really in. And there are out-of-circuit cases cited where the courts of appeals have said, well, if you don't move to amend and you don't present us with a proposed complaint, if you didn't do that for the district court, how can we fault the district court for not granting a motion that was never made? And I think for that reason alone, it's not an abuse of discretion. But then again, when you look at what he's relying on, what he's really saying is... he really goes back to his original allegations. I mean, as the district judge pointed out, the additional documents don't really add anything. He's had full discovery. He conceded that today to the court. So it's not even as if you could say, well, you know, we should send it back and maybe he could do some discovery. I mean, he's never made the case for that. He says he has everything, so... Does it matter that it was Mr. Marks who had this certified as a final and appealable order? Does that factor in at all or no? I don't think so, Your Honor. I don't think it facts into that stage of the analysis. I think what it really comes down to at the end is that he didn't move to amend, he didn't present a proposed complaint, and I think he stands or falls on his original complaint as far as what his allegations show. And again, I'd just direct the court to the integral documents, which the district court judge correctly, you know, analyzed and said that they just don't... There's no there there. There's just no malice shown by those documents. Thank you, Your Honor. Unless the court has any questions, we'd ask that the decision be affirmed. Thank you. Thank you. Mr. Smith? I'd like to address one question that had been asked previously and then also a comment that was made on rebuttal regarding the cases that we rely on all showing some sort of close nexus of people knowing each other or, you know, repossessing a car because they got upset. We cite a variety of cases in which,   between two individuals who were in a car, and there was a sudden interaction between two individuals and there wasn't any planned knowledge. And what we would submit to the court is that this is more akin not to a sudden interaction where a state employee does something that can be deemed malicious because that would be more akin to the state making an investment that happens to have an adverse effect on a minority shareholder. That's distant, doesn't know the person, the intent of the investment is simply to negotiate a deal, and it has the incidental effect of harming someone. That's remote, and they don't know the person. In other cases that we've cited, where, for example, in Aqua v. Harper, in that case, it was an arrest at an airport. Officer didn't know that person beforehand, but it was deemed that he acted in a way interacting with that person where a jury could determine that it was malicious. Well, in this instance, Mr. Dan didn't need to meet Mr. Marks to know what he needed to know about him to call him a rogue shareholder. He didn't need to meet Mr. Marks to know what he needed to know about him to call him unreasonable or not wanting to predict what an unreasonable person like Marks might do. He didn't need to meet him to do that. He learned about it. He reviewed the cases in the other litigation. He spoke with litigation counsel. He got to know him, and he got to know him sufficiently to be able to design a deal that aided and abetted a breach of fiduciary duty and ultimately put a dilutive transaction squarely on his shoulders right ahead of a mediation that had been court-ordered, where our belief and our contention would be at that time, we found out about this deal in discovery. It wasn't disclosed. It's financial and valuation discovery. We found out about it, and our belief is that they intended to tell us that at the mediation. There had been an investment at this arm's-length transaction of a very low dollar amount, and I'm very sorry. You've also been massively diluted. Can we work out a settlement? That's our belief as to how we were supposed to have found out about what happened, and our belief is that the evidence will show that that was indeed the design, and that, in our opinion, is aiding and abetting a breach of duty, and to answer your question, Judge Harris, there are limits. There are limits to what a person can do in trying to negotiate a good deal, and I look at ACWA, and I would think that one standard the Court might consider is accepting as true the well-pled facts in the complaint and viewing them in the light most favorable. To Marx, the question for purposes of immunity under the State Tort Claims Act is whether he stated a claim that could plausibly find that Dan's conduct, given all of the existing and antecedent circumstances, was motivated by ill will, by an improper motive, or by an affirmative intent to injure Marx. That motive or animus may exist even when the conduct itself is objectively reasonable. If it does, there is no immunity under the State Tort Claims Act. So even if someone might look at it being a good deal, that does not foreclose the possibility that Dan acted in a malicious way to, for example, as Judge Floyd pointed out, the concept of malice is broader, to intentionally injure Marx. So, for example, if he said, here's the way we're going to design the deal. We're going to use an artificially low valuation so that you can present that to Marx in a mediation and use that as a way to value the entity. In addition, we're going to provide you kickbacks to ensure that you're not harmed by that investment and therefore the dilution will be shouldered by Marx. And I set out to understand that I'm going to do that to him because he's a minority shareholder, because I think he may have done these things at the company that counsel mentioned, which we don't believe are true, and therefore the state will ultimately get a good deal by injuring Marx. Our belief is that if the law says, look, as long as you get a good deal for the state, that can't be malicious. For example, if a police officer were to pull someone out of a car for the purpose of, they think, effectuating an arrest or something of that nature, and were to beat that person or hurt that person and they say, look, I was just trying to get that person under control. Well, the law says in certain instances, and the cases have found where there's that level of action or conduct, that malice can be inferred, or at least a jury has an ability to determine that. And our view is that if the law were to say, you know what, you are working for this Maryland Venture Fund. You may go out there, you may commit intentional torts, you personally, and we're going to sign off on that. That's not malicious. That's how we do business. That if that's the case, and that conduct can't be deemed malicious, it would set a dangerous and horrible precedent. Then you would sue the state in state court, right? The state has waived. Then the state would say, look, that's just sort of ordinary misconduct. We do not hold our individual employees personally liable when they go so far beyond ordinary misconduct. It's not intentional torts that aren't immunized. It's malicious. Malicious conduct. In all the other cases, sue us. They're working for us. You don't like the way the state is operating, sue us. That's the way the immunity is supposed to work. So I guess I'm just trying to say that just as a policy matter, it's not as though the state can do whatever it wants. The state can still be sued. It just has to be in state court. I understand, Your Honor, but what it would provide a license for the individual state employees without having any personal... because the law says that the state employee has personal responsibility if they act in a malicious way. The state doesn't sign off on that. So if we say that, look, a former director, a venture capital expert who works for the state, has license to go out and target minority shareholders, commit intentional torts by aiding and abetting breaches of duty, and to the extent that that's uncovered, that individual has no personal liability for that. That individual doesn't have to answer for it. That individual can simply sit back as working for the state and allow it to be handled by state court, we think would be very dangerous because it would encourage precisely this type of behavior. State is then held liable in the state court action that individual is going to just sort of escape scot-free. And continue on. You think that's what will happen, that the state will be now held liable for some enormous judgment because of what their personal... Well, they wouldn't. I mean, in this instance, there wouldn't be an enormous judgment because of the cap. So the state would have the ability to say, go out and do all those things, aid and abet intentional breaches, and you know what? We've got this cap. If they need to touch us in state court, as long as the amount of the cap is less than the investment you were able to get for us, don't worry about that intentional breach. Just go ahead and keep doing it. And that's different than a private company has. So basically, I really am trying to get a handle on your policy argument, and it seems to be the cap's too low. The cap is too low, so it's not viable to do this the way the kind of statute contemplates that for ordinary, even ordinary intentional torts, you sue the state. But that doesn't really work because of the cap, so instead we should kind of expand liability on the personal side. I don't think we're expanding liability, Your Honor. I think the malice is met here. I think it's more recognition that the definition of malice in this commercial context applies. And the cap is just particularly egregious in the circumstances where the state is making multi-million dollar investments in multi-million dollar deals because it would artificially create a ceiling. And then they'd be able to say that you can't prove malice, the person didn't do it wrong, and for the purpose of the court's policy point, for the purpose of the employee's job, they could say, look, as long as the amount is less than what you got for the state, no worries, let's go on and continue elbowing tomorrow. And we think that would be a horrible policy decision, not just for the total liability, but for the license that it would give a state employee. We don't believe that the Maryland Venture Fund goes out into the private marketplace with intention of devaluing and harming a minority shareholder or aiding or abetting breaches of duty. We just think they're trying to invest in companies and get a reasonable investment. Okay, thank you, Mr. Smith. Yes, thank you. The court will be in recess at this time. This honorable court stands adjourned until tomorrow at 9.30. God save the United States and this honorable court. And we'll be coming down to Greek Council on Tuesday.
judges: Barbara Milano Keenan, Henry F. Floyd, Pamela A. Harris